

Erik Strindberg (Bar No. 4154)
Lauren Scholnick (Bar No. 7776)
Erika Birch (Bar No. 10044)
**STRINDBERG SCHOLNICK & CHAMNESS, LLC**
44 Exchange Place, 2nd Floor
Salt Lake City, UT 84111
Telephone: (801) 359-4169
Attorneys for Plaintiff

RECEIVED CLERK
**FILED**
2005 MAR 16  P 5: 50

U.S. DISTRICT COURT
DISTRICT OF UTAH

## UNITED STATES DISTRICT COURT
### DISTRICT OF UTAH, CENTRAL DIVISION

|  |  |
|---|---|
| **KRYSTAL S. ETSITTY**<br><br>Plaintiff,<br><br>vs.<br><br>**UTAH TRANSIT AUTHORITY** and **BETTY SHIRLEY**, in her individual and official capacities,<br><br>Defendants. | **PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Case No. 2:04CV00616 DS<br><br>Judge David Sam |

Plaintiff, Krystal S. Etsitty ("Etsitty"), through her undersigned attorneys, hereby submits

this Memorandum in Support of Motion For Partial Summary Judgment pursuant to Federal Rule

of Civil Procedure 56.

49

**TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

STATEMENT OF UNDISPUTED FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      SUMMARY JUDGMENT STANDARD  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     ETSITTY IS PROTECTED UNDER TITLE VII AND THE EQUAL PROTECTION
        CLAUSE BECAUSE SHE WAS TERMINATED SOLELY BECAUSE SHE DID
        NOT CONFORM TO UTA'S STEREOTYPICAL GENDER EXPECTATIONS,
        DESPITE HER STELLAR WORK RECORDS AND HER UNDISPUTED ABILITY
        TO PERFORM HER JOB
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.    ETSITTY WAS THE VICTIM OF UTA'S UNLAWFUL DISCRIMINATION . . . 11
        A.    Defendants Admit That They Fired Etsitty Based on Gender Stereotypes
              Rather than on Anything to Do with Her Performance at Work Which They
              Acknowledge to Have Been Exemplary  . . . . . . . . . . . . . . . . . . . . . . . . . 11
        B.    The Circumstantial Evidence Also Shows UTA Fired Etsitty Solely Because
              of Her Perceived Gender Non-conformity . . . . . . . . . . . . . . . . . . . . . . . . 14

IV.     UNDER THE *MCDONNELL DOUGLAS* BURDEN SHIFTING ANALYSIS, UTA
        CANNOT MEET ITS BURDEN. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
        A.    UTA's Proffered Reason for Terminating Etsitty Does Not Constitute a
              "Legitimate and Non-discriminatory" Reason . . . . . . . . . . . . . . . . . . . . . 18
        B.    UTA Cannot Raise a Genuine Issue of Fact That Restroom Choice Is a
              BFOQ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

V.      EVEN IF UTA'S REASON IS "LEGITIMATE AND NON-DISCRIMINATORY,"
        IT IS NOTHING BUT PRETEXT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

VI.     ETSITTY IS ENTITLED TO SUMMARY JUDGMENT ON HER EQUAL
        PROTECTION CLAIMS AGAINST DEFENDANTS  . . . . . . . . . . . . . . . . . . . . . 26

VII.    AS AN ALTERNATIVE TO HOLDING THAT ETSITTY IS PROTECTED
        UNDER TITLE VII FOR ENGAGING IN GENDER NON-CONFORMING
        CONDUCT, ETSITTY IS ALSO PROTECTED BECAUSE OF HER STATUS AS
        A TRANSSEXUALS AND/OR HER "BIOLOGICAL SEX."
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

INDEX TO EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

ii

**INTRODUCTION**

This is a unique case in that it is undisputed by Defendants that Plaintiff Krystal Etsitty (hereinafter "Etsitty") had a spotless work record while she worked at Utah Transit Authority (hereinafter "UTA") as a bus operator. It is undisputed that there were <u>no</u> complaints made about Etsitty, her performance, appearance, restroom usage or anything else, by any UTA employee, customer, member of the public or anyone else at any time. It is undisputed that Etsitty performed her job duties without any difficulty; she was never warned or disciplined, had no tardies or absences. Despite her exemplary work record and her undisputed ability to perform her job, Etsitty was terminated because she did not conform to UTA's stereotypical gender expectations.

Etsitty has a female gender identity and has always known that she is female, despite being born with a male body. She was hired by UTA as a bus driver in the Fall of 2001. After she was hired, Etsitty began appearing in a less stereotypically masculine fashion. After discussing her intentions with her direct supervisor, Pat Chatterton ("Chatterton"), Etsitty began to appear more stereotypically feminine at work (wearing make-up, earrings, fingernail polish, *etc.*). Chatterton had no difficulty with this (or the fact that Etsitty told him that she was transsexual), but felt it necessary to report the matter to his supervisor, Betty Shirley ("Shirley"), who was in charge of the Division where Etsitty was assigned. Shirley had already heard rumors about Etsitty's gender non-conforming appearance. Within a few days of her conversation with Chatterton, Shirley fired Etsitty because she was concerned that Etsitty's "image" presented a problem for UTA because Etsitty did not meet UTA's gender stereotypes about how men and women should dress and appear. Shirley testified: "[w]e . . . felt that there was an image issue

iii

out there for us, that we could have a problem with having someone who, even though his appearance may look female, he's still a male because he still had a penis." (SOF, ¶ 58, below)

Several circuit courts, as well as federal district courts, have held that discrimination based on gender non-conforming conduct, such as a male appearing or presenting like a female, violates Title VII of the Civil Rights Act.  These decisions are predicated on the Supreme Court's holding in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) that gender stereotyping violates Title VII.  One of the most recent of these cases is *Smith v. City of Salem, Ohio*, 378 F.3d 566 (6th Cir. 2004).  The Sixth Circuit Court of Appeals held that a transsexual firefighter who started to appear more feminine at work, and was forced to resign as a result, had a cause of action under Title VII for discrimination because she was discriminated against for failing to conform to a gender stereotype.  While the Tenth Circuit Court of Appeals has not yet ruled on this issue, a recent unpublished decision indicates that it is likely to find, when presented with the issue, that discrimination based on gender non-conforming conduct is a violation of Title VII.  *James v. Platte River Steel Co., Inc.*, 2004 U.S. App. LEXIS 22157 (10th Cir. 2004)(recognizing that a plaintiff can establish a claim under Title VII by showing that the "harasser's conduct was motivated by a belief that the plaintiff did not conform to the stereotypes of his or her gender"), attached as "Exhibit L."

UTA's termination of Etsitty, if allowed to stand, would be a signal to employers that they are free to discriminate against employees who do not conform to stereotypes of how men and women should appear and act.  Instead, this Court should hold that employees must be judged <u>solely</u> on how they perform their duties, by finding that discrimination based on gender

iv

stereotypes, or, in other terms, gender non-conforming conduct, violates the law against workplace discrimination.

## STATEMENT OF UNDISPUTED FACTS

### What does it mean to be transsexual?[1]

1.    From a medical perspective, sex is not determined solely by a person's chromosomes. Other criteria are equally or more important. These criteria include: hormones, internal and external genitalia, gender identity, gender role, and the sexual differentiation of the brain. The single most important factor is the person's gender identity, which is the person's psychological identification as male or female. (Affidavit of Dr. Walter J. Meyer III ("Meyer Aff."), ¶ 10)[2]

2.    Gender identity is a person's internal psychological identification as male or female. Transsexualism is a medical condition in which a person's gender identity does not match their anatomical sex at birth. The contemporary medical term for this condition is "gender identity

---

[1]  The term "transgender" arose in the mid-1990s from the grassroots community of gender-different people.  The term transgender is inclusive of individuals diagnosed as "transsexuals," including pre-operative, post-operative and non-operative transsexuals. *See Transgender Equality: A Handbook for Activists and Policymakers* (Policy Institute of the Nat'l Gay and Lesbian Task Force & Nat'l Ctr. for Lesbian Rights)June 2002 at 3.  The term "transsexual" can be used, at times, interchangeably with the term "transgender." *Embracing Law's Categories: Anti-Discrimination Laws and Transgenderism* 15 Yale J L Feminism 51, n.3 (2003).

[2] The Affidavit of Dr. Walter J. Meyer III is attached as Exhibit A; Excerpts from the Deposition of Krystal Etsitty ("Etsitty Dep.") are attached as Exhibit B; Excerpts from the Deposition of Betty Shirley ("Shirley Dep.") are attached as Exhibit C; Excerpts from the Deposition of Pat Chatterton ("Chatterton Dep.") are attached as Exhibit D; Excerpts from the Deposition of Bruce Cardon ("Cardon Dep.") are attached as Exhibit E; Excerpts from the Deposition of Jerry Benson ("Benson Dep.") are attached as Exhibit F; Deposition Exhibits as referenced are attached as Exhibit G; Defendants' Answer to Amended Complaint is attached as Exhibit H; Defendants' Response Plaintiff's First Set of Written Discovery is attached as Exhibit I; Defendant's Response to Plaintiff's Second Set Of Written Discovery is attached as Exhibit J; Defendants' Responses to Plaintiff's Fourth Set of Written Discovery is attached as Exhibit K; Unpublished Cases as referenced are attached as Exhibit L.

disorder." Transsexualism, or gender identity disorder, has been recognized as a medical condition for several decades. (Meyer Aff., ¶ 6)

3.    Based on current medical knowledge and research, transsexualism appears to have a biological cause. Specifically, transsexualism appears to be caused by an anomaly in the sexual differentiation of the brain such that the person develops the brain sex of one gender and the anatomy of the other gender. (Meyer Aff., ¶ 11)

4.    Specialists in gender identity agree that the transsexual condition establishes itself very early, before a child is capable of making any conscious choice about his or her identity. (Meyer Aff., ¶ 8)

5.    A person's gender identity cannot be changed. Transsexualism is based on a person's innate gender identity; it cannot be "cured" through therapy or medication. (Meyer Aff., ¶ 9)

6.    In the past, some therapists tried to "cure" transsexual people through aversion therapies, electro-shock treatments, medication, and other therapeutic techniques. These efforts were not successful and often caused severe psychological damage. Based on contemporary medical knowledge and practice, attempts to change a person's core gender identity are considered to be futile and unethical. (Meyer Aff., ¶ 12)

7.    The conflict between a transsexual person's gender identity and body causes intense feelings of discomfort and psychological distress. (Meyer Aff., ¶ 7)

8.    Sex-reassignment typically consists of three components: hormone therapy, living in the desired gender (known as the real life experience), and sex reassignment surgery. (Meyer Aff., ¶ 15)

9.     Before being eligible for any form of sex-reassignment surgery, a transsexual person must undergo the "real-life experience," which entails living as a member of the other gender in every aspect of one's life, twenty-four hours a day, seven days a week, for at least a period of one year. This includes being accepted as a member of the other gender in one's employment, as well as one's social and personal life, including using the restroom appropriate to one's desired gender. (Meyer Aff., ¶ 17)

10.    From a medical perspective, it is appropriate and medically necessary for a person who has been diagnosed as transsexual, who has a female gender identity, and who is living her life as a woman to use the women's restroom.  Doing so is an essential element of her medically prescribed treatment and is necessary for her to qualify for sex-reassignment surgery.  (Meyer Aff., ¶ 18)

11.    The goal of medical treatment is to enable the transsexual person to be successful and comfortable living in their gender identity.  (Meyer Aff., ¶ 19)

12.    Being able to use the appropriate restroom for one's gender identity is essential to achieving this goal.  Transsexual people who are prohibited from using the appropriate restroom are prevented from integrating into society as their gender identity, which has negative consequences for the individual and, ultimately, for society as a whole.  (Meyer Aff., ¶ 20)

13.    Because the real-life experience is a prerequisite for sex-reassignment surgery, requiring a transsexual person to have sex-reassignment surgery before using the restroom corresponding to their gender identity would place transsexual people in an impossible double-bind.  (Meyer Aff., ¶ 21)

**Etsitty is transsexual and has been diagnosed with "Gender Identity Disorder."**

14.    Etsitty has a female gender identity and has always known that she is female, despite being born with a male body.  (Etsitty Dep. at 70, 73-4, 78).

15.    Etsitty was born on February 19, 1963.  From early in her life, Etsitty had the feeling that she was female and had been born with the wrong anatomical sex.  In grade school she started dressing in women's clothes. (Etsitty Dep. at 73-4)

16.    Sometime prior to October of 1997 Etsitty began to live and dress as a female, except when she was at work. (Etsitty Dep. at 78, Dep. Exhibit 4, Bates No. ETSIT00120, attached as "Exhibit G")

17.    Etsitty began seeing Lucille Hesse, Licensed Social Worker, in October of 1997 for *counseling about issues related to her gender identity.  (Etsitty Dep. at 70)*

18.    Hesse diagnosed Etsitty as having Gender Dysphoric Disorder.  This is also referred to as Adult Gender Identity Disorder.  (Etsitty Dep. at 90, Dep. Exhibit 4, Bates No. ETSIT00116, attached hereto as "Exhibit G")

19.    Etsitty was referred to an endocrinologist and started taking female hormones in approximately January of 1998.  (Etsitty Dep. at 91)

20.    Etsitty was advised by her doctors that once she starting taking female hormones, many of the changes that occurred would be irreversible.  (Etsitty Dep. at 91)

21.    At about this time, Etsitty began to live and dress as a female both outside of and during work.  (Etsitty Dep. at 89, 92)

22.    Subsequently Etsitty also underwent laser and electrolysis treatments to remove body hair so she would look more feminine. (Etsitty Dep. at 157)

**Etsitty was successfully driving a bus when she was fired.**

23.    Etsitty started her training with Defendant Utah Transit Authority ("UTA") on October 24,

2001.  She went through a six week training course, which consistent first of classroom work and

then of driving buses accompanied by operator instructors.  Etsitty successfully completed both

parts of the course.  (Shirley Dep. at 15) (Etsitty Dep. at 140)

24.    After successfully completing training, Etsitty was assigned to the "extra-board" on

December 6, 2001. New operators, such as Etsitty, are always assigned to the "extra board."

(Shirley Dep. at 16-7) (Etsitty Dep. at 140-1, 148)

25.    Operators assigned to the extra-board fill in for regular operators who are on vacation or

who call in sick.  They drive regular UTA buses and routes, but are not assigned a permanent

route. (Shirley Dep. at 16-7) (Etsitty Dep. at 140-1, 148)

26.    During the two months that she was on the extra-board, Etsitty drove all or part of

approximately one-half of the 115-130 routes in the Salt Lake area.  During that period she

reported to team supervisor, Pat Chatterton ("Chatterton"). (Shirley Dep. at 16-19,26) (Etsitty

Dep. at 140-1, 148) (Chatterton Dep. at 26) (Etsitty Dep. Exhibit 8, attached hereto as "Exhibit

G")

27.    While driving, Etsitty was required to wear a uniform.  The male and female uniforms are

very similar in appearance.  In fact, some female operators wear the male uniform because it is

more comfortable. (Chatterton Dep. at 50) (Shirley Dep. at 50-52)

28.    UTA has no rules regarding hairstyle, jewelry or makeup for its operators.  Rather, they

expect them to be clean and pressed [*sic*] and exhibit proper hygiene.  (Shirley Dep. at 53)

**There were <u>no</u> complaints made about Etsitty at any time.**

29.     Etsitty's work record was <u>spotless</u>; there were <u>no</u> complaints made about Etsitty by any

UTA employee, customer, member of the public of anyone else at any time.  (Shirley Dep. at 60,

92) (Chatterton Dep. at 30, 35) (Cardon Dep. at 70) (Defendant's Response to Request for

Admission No.1 to Plaintiff's Second Set Of Written Discovery, attached hereto as "Exhibit J")

30.     UTA never received any complaints about Etsitty's performance, appearance, restroom

usage or anything else regarding Etsitty from any UTA employee.  (Shirley Dep. at 60)

31.     UTA never received any complaints about Etsitty's performance, appearance, restroom

usage or anything else regarding Etsitty from UTA customers or people who rode the bus.

(Shirley Dep. at 60) (Chatterton Dep. at 37) (Cardon Dep. at 58)

32.     UTA did not receive any complaints about Etsitty's performance, appearance, restroom

usage or anything else regarding Etsitty from any business owners.  (Shirley Dep. at 60) (Cardon

Dep. at 58)

33.     UTA did not receive any complaints about Etsitty's performance, appearance, restroom

usage or anything else regarding Etsitty from anyone in the public.  (Shirley Dep. at 60, 92)

(Chatterton Dep. at 37) (Cardon Dep. at 58)

**Etsitty had <u>no</u> performance issues.**

34.     Chatterton, Etsitty's immediate supervisor, felt that Etsitty was a good bus operator.

(Chatterton Dep. at 51)

35.     At no time was Etsitty ever disciplined while she worked for UTA. (Chatterton Dep. at 30)

(Shirley Dep. at 72-3)

36.     Etsitty was performing her driving duties satisfactorily.  (Defendants' Answer to Amended

Complaint ("Answer"), ¶ 24)

x

37.     In short, Etsitty had <u>no</u> performance issues and performance did not play a part in her termination. (Shirley Dep. at 109) (Chatterton Dep. at 30) (Etsitty Dep. at 165).

**Shortly after she was hired, UTA began to discriminate against
Etsitty for her perceived failure to conform to gender stereotypes
as she began appearing in a less stereotypically masculine fashion.**

38.     When Etsitty was first hired, UTA did not care (or even know) what gender she was. (Shirley Dep. at 89)

39.     When Etsitty was first hired she dressed in a more stereotypical masculine way. She then told her supervisor that she was going to gradually start dressing more femininely. (See paragraphs 44-45 below) (Shirley Dep. at 85) (Chatterton Dep. at 33) (Etsitty Dep. at 149)

40.     Etsitty had legally changed her name from "Michael" to "Krystal" on January 26, 1999 – something she disclosed to UTA in her application materials. (Cardon Dep. at 42-43, Dep. Exhibit 7, attached as "Exhibit G")(Chatterton Dep. at 52-53)

41.     Etsitty requested that her employee badge identify her by "Krystal," her legal name. This request was granted. (Etsitty Dep. at 144) (Defendants' Response to Request for Admission No.1 to Plaintiff's First Set of Written Discovery, attached hereto as "Exhibit I")

42.     Gradually, Etsitty began to appear more feminine at work. For example, she began to wear more noticeable make-up, to wear earrings, and to polish her fingernails. (Defendants' Answer, ¶ 20) (Etsitty Dep. at 149-151) (Chatterton Dep. at 34)

43.     Betty Shirley, the operations manager over the Meadowbrook facility, where Etsitty was assigned, first heard about Etsitty when she heard rumors that there was a "male" bus operator wearing makeup. (Shirley Dep. at 13-14, 38)

**Etsitty was terminated because she did not fit UTA's stereotype
of how an anatomically male person should appear and behave.**

44.     Around the same time, Etsitty approached her supervisor, Chatterton, and told him that she

was transsexual and would be appearing more traditionally feminine at work.  Etsitty did this

because she wanted to avoid future problems.  (Etsitty Dep. at 149-150)

45.     Chatterton was supportive of Etsitty and did not have any objections to having Etsitty at

work.  (Chatterton Dep. at 32, 44) (Shirley Dep at 61)

46.     Without Etsitty's knowledge, Chatterton approached Shirley and told her that Etsitty was

going through a sex change.  (Chatterton Dep. at 33) (Shirley Dep. at 38)

47.     Shirley was the Operations Manager over the division where Etsitty was assigned, and

was responsible for all phases of the bus system in that division. (Shirley Dep. at 12)

48.     Chatterton brought Etsitty's transsexual status to Shirley's attention, only because he

wanted UTA to be supportive of Etsitty and to keep her on the job.  He did not have any

complaints about Etsitty. (Shirley Dep. at 61) (Chatterton Dep. at 32, 44)

49.     Shirley told Chatterton that she would check with Human Resources ("HR") and that she

was worried about restroom usage by Etsitty.  (Shirley Dep. at 56-7)

50.     Etsitty was the first transsexual individual that Shirley had encountered in the workplace

and she does not know why the issue of restrooms came to mind.  (Shirley Dep. at 57-8)

51.     Shirley talked with Bruce Cardon in HR and they decided that they needed to talk with

Etsitty.  Both of them expressed concern to each other that there might be liability for UTA if

Etsitty used female restrooms. (Shirley Dep. at 73-4, 80) (Cardon Dep. at 35)

52.     They met with Etsitty a day or two later, on February 15, 2002.  They asked Etsitty where

she was in the sex change process. Etsitty stated that she did not have the money to complete the

process, but was planning on doing so.  (Shirley Dep. at 76-9, 84) (Etsitty Dep. at 173)

53.    Shirley also asked if Etsitty used the restroom at UTA's facility and Etsitty told them no, because she was rarely at the UTA facilities.  Shirley was, thereafter, <u>supposedly</u> no longer worried about Etsitty's restroom usage at UTA facilities and it did not figure in her decision to terminate Etsitty.  (Shirley Dep. at 90, 131)

54.    Etsitty recalls that this meeting started with questions about what the term "transgendered"[3] meant.  After she explained what it meant, Etsitty was told "Well, that's the reason why we're terminating you, because you're transgender.  We're not sure which restrooms to [*sic*] use."  (Etsitty Dep. at 161-163)

55.    Etsitty responded that there was no need to "accommodate" her as she looked female and no one would question her use of female restrooms unless they saw her unclothed, which would not occur.  (Etsitty Dep. at 161-164)

56.    Shirley and Cardon said they would hold off on termination until they checked with UTA's lawyers.  (Etsitty Dep. at 161-164) (Shirley Dep. at 91)

57.    Shirley, however, immediately took Etsitty off the extra-board and placed her on administrative leave (with pay) after this initial meeting. (Etsitty Dep. at 168)

58.    Shirley and Cardon subsequently talked on the telephone about how "we both felt that there was an image issue out there for us, that we could have a problem with having someone who, even though his appearance may look female, he's still a male because he still had a penis." (Shirley Dep. at 94)

59.    Cardon believed that Etsitty's failure to conform to their expectations about how an anatomically male person should appear and behave presented a serious image problem for UTA.

---

[3] "Transgendered" is a synonym for transsexual; these terms can be used interchangeably.

"We have expectations of operators and how they appear to the public.  Those expectations are pretty broadly defined, but if we see something that is considered radical or could be interpreted by the public as being inappropriate, we talk to the operators about that and expect them to a have a professional appearance."  (Cardon Dep. at 56. 59)

60.     Three days after the first meeting, on February 18, 2002, Shirley made the decision to terminate Etsitty.  Shirley explained that she terminated Etsitty due to "liability for UTA."  Shirley claims this meant that someone might take offense at the restroom Etsitty used and sue UTA. (Shirley Dep. at 98-9) (Cardon Dep. at 56)

61.     At the termination meeting Shirley told Etsitty that they were releasing her from UTA because "[UTA] could not accommodate restroom needs."  (Shirley Dep. at 109) (Cardon Dep. at 90)[4]

62.     As the operations manager over the Etsitty's division, Shirley had the authority to make the final decision regarding terminating Etsitty.  (Benson Dep. at 47-9)

63.     Shirley's decision to terminate Etsitty was not subject to review by a higher level manager.  (Benson Dep. at 49)

---

[4] Etsitty's recalls that it was Cardon who made the comment that they could not accommodate her needs, not Shirley.  This is an unimportant distinction as her recollection is consistent as to what was said. (Etsitty Dep. at 170)

64.    Etsitty who was still a probationary employee at the time she was terminated, and under the Collective Bargaining Agreement could not appeal or grieve her termination.[5] (Cardon Dep. at 56)

65.    On the HR form that Shirley had to fill out after terminating Etsitty, Shirley marked that Etsitty would be eligible for rehire after she had her surgery (*i.e.,* went through sex reassignment surgery). (Shirley Dep. at 130)

66.    At Etsitty's unemployment hearing, Shirley also testified that UTA was "unable to meet accommodations" for Etsitty's restroom use and that is why UTA fired Etsitty. (Shirley Dep. at 37-8)[6] (Shirley Dep. Exhibit 15, pp. 15-23, attached as "Exhibit G")

67.    Prior to that hearing, UTA told the Department of Workforce Services the following: "*Employer decided that keeping the claimant would cause more issues with sexual harassment that by discharging claimant, so claimant was discharged.*" (Shirley Dep. Exhibit 20, attached as "Exhibit G")

68.    After Etsitty was given unemployment benefits, UTA appealed. As part of its appeal it argued that "Although the claimant indicates that she is under a doctor's care in regard to the gender transformation . . . There is no indication that there is any medical necessity or

---

[5]  Article 7 of the CBA specifically addresses probation and termination of new employees:

> All employees shall be on probation until they have worked one hundred ten (110) days. During such period UTA is the sole judge of ability, competency, fitness and qualifications to perform work. This judgment shall not be subject to the grievance or arbitration procedure.

[6] At the unemployment hearing, Cardon tried to argue that Etsitty was fired for errors on her employment application. This assertion is without merit. Shirley testified she terminated Etsitty solely because of her concern about UTA liability and not because of what was on Etsitty's application. In fact, Shirley never even looked at Etsitty's applications. (Shirley Dep. at 120, 135 attached as "Exhibit C")

justification for such a change.  It is purely a choice made by the claimant." (Cardon Dep. Exhibit 13, attached as "Exhibit G")

**UTA made <u>no</u> attempts to determine whether there was any factual or legal basis for its alleged concerns that Etsitty's restroom use would cause problems for UTA.**

69.     Although UTA professes concern that permitting Etsitty to use the restroom might have exposed UTA to complaints or to some unspecified "liability," neither Shirley, nor any other UTA employee ever made any inquiries to determine if anyone might be offended to share a restroom with Etsitty.  (Shirley Dep. at 126) (Cardon Dep. at 65)

70.     UTA never investigated whether anyone along Etsitty's routes had any complaints about Etsitty's restroom usage when she was driving those routes.  (Shirley Dep. at 129) (Cardon Dep. at 67)

71.     UTA never investigated what type of restrooms (*i.e.*, single or unisex) were available to Etsitty on her routes, although UTA had an employee whose job it was to find restrooms for operators to use when driving.  (Shirley Dep. at 129) (Cardon Dep. at 67)

72.     UTA never spoke with any of Etsitty's former employers regarding her use of restrooms or whether there had been any complaints about her usage. (Defendants' Responses To Request for Admission Nos. 1 & 2 to Plaintiff's Fourth Set of Written Discovery, attached as "Exhibit K")

**Etsitty was treated differently with regard to restroom usage than other UTA operators.**

73.     UTA (and Shirley in particular) has received complaints about non-transsexual bus operators using restrooms on their routes.  Shirley was involved in resolving two of these complaints. (Shirley Dep. at 114)

74.     The first involved one or more bus operators using restrooms at a hotel in the 5600 West area. The second involved operators using restrooms at what was the Hilton (now Sheraton) Hotel near downtown Salt Lake City. (Shirley Dep. at 114-8)

75.    The Hilton Hotel manager told UTA that he just did not want the bus operators in there anymore. (Shirley Dep. at 114-8)

76.    In both instances, the complaints seemed to center around bus operators leaving the restrooms a mess and congregating around the business. UTA simply directed the operators not to use either facility. No one was fired or even disciplined because of the complaints. (Shirley Dep. at 114-8)

77.    UTA has continued to hire bus operators since Etsitty was fired. (Shirley Dep. at 29-30)

**ARGUMENT**

## I.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court, in applying this standard, must draw all reasonable inferences from the factual record in a manner most favorably to the nonmovant. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Hirase-Doi v. U.S. West Communications*, Inc., 61 F.3d 777, 781 (10th Cir. 1995). An issue is "genuine" if there is sufficient evidence on each side such that a rational trier of fact could resolve the issue either way. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of fact is "material" if, under the substantive law, it is essential to the proper disposition of the claim. *Id.*

II.   **ETSITTY IS PROTECTED UNDER TITLE VII AND THE EQUAL PROTECTION CLAUSE BECAUSE SHE WAS TERMINATED SOLELY BECAUSE SHE DID NOT CONFORM TO UTA'S STEREOTYPICAL GENDER EXPECTATIONS, DESPITE HER STELLAR WORK RECORDS AND HER UNDISPUTED ABILITY TO PERFORM HER JOB**

Title VII of the Civil Rights Act of 1964 provides, in relevant part, that "it shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individuals race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).[7] Title VII is a remedial statute that should be liberally construed. *Jackson v. Continental Cargo-Denver*, 183 F.3d 1186, 1189 (10th Cir. 1999). Title VII's sex discrimination prohibitions do not merely prohibit discrimination by men against women; nor do they merely prohibit the specific types of discrimination that Congress had in mind when it enacted Title VII. Rather, those prohibitions must be construed broadly to cover "reasonably comparable evils" such as discrimination involving same sex harassment and sex stereotyping. *Oncale v Sundowner Offshore Oil Servs.*, 523 U.S. 75, 79 (1998)(even though Congress likely was not thinking of male-on-male harassment when it enacted Title VII, the statute must be construed broadly to effectuate its purpose of eradicating sex discrimination in employment); *Price Waterhouse v. Hopkins*, 490

---

[7] Section 1983 provides a remedy for state action that intentionally discriminates in violation of the equal protection clause of the Fourteenth Amendment. *Poolaw v. City of Anadarko*, 660 F.2d 459, 462 (10th Cir. 1981), *cert. den.* 469 U.S. 1108 (1985). This includes relief from discriminatory employment practices. *Id.* Cases establish that, the elements of a plaintiff's case are the same, based on the disparate treatment elements outlined in *McDonnell Douglas*, whether that case is brought under §§ 1981 or 1983 or Title VII. *Drake v. Ft. Collins*, 927 F.2d 1156, 1162 (10th Cir. 1991); *Daniels v. Bd. of Educ.*, 805 F.2d 203, 207(6th Cir. 1986)(the order and allocation of proof applicable in a Title VII disparate treatment case can be utilized in discrimination claims arising under § 1983.); *Smith v. City of Salem*, 378 F.3d 566, 577 (2004)('the showing a plaintiff must make to recover on a disparate treatment claim under Title VII mirrors that which must be made to recover on an equal protection claim under section 1983.' *citing Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir. 1988)).

U.S. 228 (1989) (Title VII prohibits discrimination against a person because he or she fails to conform to gender stereotypes).

In the past, courts often held that transsexual individuals were not protected under Title VII on the grounds that Congress did not intend to cover transsexuals when it enacted Title VII and that the term "sex" must be narrowly construed and does not include discrimination based on gender stereotypes. *See, e.g., Ulane v. Eastern Airlines*, 742 F.2d 1081, 1084 (7th Cir. 1984) ("we are constrained to hold that Title VII does not protect transsexuals"); *Holloway v. Arthur Anderson*, 566 F.2d 569 (9th Cir. 1977) (holding that the term "sex" in Title VII refers only a person's biological identity as male or female). In the twenty years since *Ulane* was decided, however, both federal and state courts have rejected the reasoning in these older cases as archaic and contrary to the expansive application of sex discrimination statutes by the United States Supreme Court in *Price Waterhouse*, 490 U.S. 228 and *Oncale*, 523 U.S. 75.

In *Price Waterhouse*, the Court held that punishment for failure to conform to sex stereotypes (including stereotypical norms about dress and appearance) can be an actionable form of sex discrimination. 490 U.S. at 251. In *Price Waterhouse*, a female senior manager in an accounting firm was denied partnership in the firm, in part, because she was considered too "macho" for a woman. *Id.* at 235. She was advised that she could improve her chances for partnership if she were to take "a course at charm school," "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." *Id.* (internal quotation marks omitted). The Supreme Court held, "in the context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender." *Id.* at 250. The Court emphasized that "we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched

3

the stereotype associated with their group." *Id.* at 251. In determining that the type of

discrimination faced by the plaintiff was indeed barred by Congress in Title VII, the Supreme

Court determined that Congress "intended to strike at the entire spectrum of disparate treatment

of men and women resulting from sex stereotypes." *Id.* at 251. The Supreme Court based its

ruling on the language of Title VII, which bans discrimination "because of . . . sex."[8] *Id.*

Further, in holding that Title VII prohibits same-sex harassment, the Supreme Court in

*Oncale* rejected the notion that the scope of a statute is limited to what the enacting Congress

specifically intended to cover, as opposed to what the language and purpose of the law

reasonably may be construed to cover. 523 U.S. at 79. Noting that "statutory prohibitions often

go beyond the principal evil to cover reasonably comparable evils," the Supreme Court instructed

lower courts to apply Title VII expansively to cover any situation in which a plaintiff can show

discrimination because of sex. *Id.*

In the wake of *Price Waterhouse* and *Oncale*, a growing number of federal courts rightly

have concluded that *Ulane* and its progeny are no longer good law. Recently, for example, the

Sixth Circuit decided a case with facts virtually identical to those in this case. In *Smith v. City of

Salem*, 378 F.3d 566 (2004), a firefighter with an impeccable record over his seven years with the

city's fire department, began treatment for his Gender Identity Disorder. When he began

"expressing a more feminine appearance" at work, as prescribed by his doctors, his co-workers

---

[8] The two terms "sex" and "gender" have become interchangeable in discrimination law.
*Rentos v. OCE Office Sys.*, 72 Fair Empl. Prac. Cas. 1717 (S.D.N.Y. 1996); *Schwenk v. Hartford*,
204 F.3d 1187 (9th Cir. 2000) (Under *Price Waterhouse*, "sex" under Title VII encompasses both
sex - that is, biological differences between men and women - and gender.) Ultimately, the
debate about whether transsexual individuals are subjects of "sex discrimination" or "gender
discrimination" is of little value: it is pure semantics. The semantic debate about sex and gender
have distracted courts from the real question of what constitutes discrimination and inequality.
Here, the terms gender discrimination and sex discrimination are used interchangeably.

began questioning him, and commenting that his appearance and mannerisms were not

"masculine enough."  The City of Salem subjected Smith to three separate psychological

evaluations and later suspended him.  In upholding Smith's claim of gender discrimination under

Title VII, the Sixth Circuit wrote:

> After *Price Waterhouse*, an employer who discriminates against
> women because, for instance, they do not wear dresses or makeup,
> is engaging in sex discrimination because the discrimination would
> not occur but for the victim's sex.  It follows that **employers who**
> **discriminate against men because they do wear dresses and**
> **makeup, or otherwise act femininely, are also engaging in sex**
> **discrimination, because the discrimination would not occur but**
> **for the victim's sex**.

*Id.* at 574. (citations omitted) (emphasis added.)

The Sixth Circuit refused to accept the rationale that an individual who is transsexual

cannot assert a claim of gender stereotyping, writing, "[T]hese courts superimpose classifications

such as "transsexual" on plaintiff, and then legitimize discrimination based on the plaintiff's

gender non-conformity by formalizing the non-conformity into an ostensibly unprotected

classification."  *Id.*  In holding that the transsexual classification is irrelevant to the analysis of

whether an individual has suffered discrimination based on gender stereotypes, the Sixth Circuit

wrote:

> Such analyses cannot be reconciled with *Price Waterhouse*, which
> does not make Title VII protection against sex stereotyping
> conditional or provide any reason to exclude Title VII coverage for
> non sex-stereotypical behavior simply because the person is a
> transsexual.  As such, **discrimination against a plaintiff who is a**
> **transsexual - and therefore fails to act and/or identify with his**
> **or her gender - is no different from the discrimination directed**
> **against Ann Hopkins in *Price Waterhouse***, who, in
> sex-stereotypical terms, did not act like a woman.

*Id.* at 574-75 (emphasis added).

Similarly, in *Schwenk v. Hartford*, 204 F.3d 1187 (9th Cir. 2000), the Ninth Circuit relied

on *Price Waterhouse* and *Oncale* in concluding that transsexual individuals must be protected

under the Gender Motivated Violence Act ("GMVA") by analogizing to Title VII. The plaintiff

in the case, Crystal Schwenk, was a transsexual prisoner who sued after being assaulted by a

guard. On appeal, the guard argued that sex discrimination laws do not protect transsexuals. The

defendant relied upon a 1977 Ninth Circuit case, *Holloway*, 566 F.2d 659, which like *Ulane*, held

that the term "sex" in Title VII refers only to a person's biological identity as male or female.

*Schwenk*, 204 F.3d at 1201. The Ninth Circuit rejected the guard's argument and repudiated its

prior reasoning in *Holloway*. As the court explained:

> The initial approach taken in cases such as *Holloway* has been overruled by the logic and
> language of *Price Waterhouse*. **In *Price Waterhouse*, ... the Supreme Court held that
> Title VII barred not just discrimination based on the fact that Hopkins was a
> woman, but also discrimination based on the fact that she failed 'to act like a
> woman' – that is, to conform to socially-constructed gender expectations. Thus,
> under *Price Waterhouse*, "sex" under Title VII encompasses both sex – that is, the
> biological differences between men and woman – *and* gender.** Discrimination because
> one fails to act in the way expected of a man or a woman is forbidden under Title VII.

*Schwenk*, 204 F.3d at 1201-02 (emphasis added). Accordingly, the Ninth Circuit concluded that

Schwenk had stated a viable sex discrimination claim under GMVA and that "the evidence

offered by Schwenk tends to show that [the guard's] actions were motivated, at least in part, by

Schwenk's gender – in this case, by her assumption of a feminine rather than a typically

masculine appearance or demeanor." *Id.* at 1202.

In addition, many other circuit courts have found that discrimination based on a failure to

conform to stereotypical gender norms violates Title VII's prohibition on sex discrimination. *See*

*Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1068 (9th Cir. 2002) (en banc) (Pregerson, J.,

concurring) (noting that the Ninth Circuit had previously found that "same-sex gender

stereotyping of the sort suffered by Rene - *i.e.* gender stereotyping of a gay male employee by his

6

male co-workers" constituted actionable harassment under Title VII and concluding that "the

repeated testimony that his co-workers treated Rene, in a variety of ways, 'like a woman'

constitutes ample evidence of gender stereotyping"); *Bibby v. Philadelphia Coca Cola Bottling*

*Co.*, 260 F.3d 257, 262-63 (3rd Cir. 2001) (stating that a plaintiff may be able to prove a claim of

sex discrimination by showing that the "harasser's conduct was motivated by a belief that the

victim did not conform to the stereotypes of his or her gender"); *Nichols v. Azteca Rest. Enters.,*

*Inc.*, 256 F.3d 864, 874-75 (9th Cir. 2001) (holding that harassment "based upon the perception

that [the plaintiff] is effeminate" is discrimination because of sex, in violation of Title VII);

*Rosa v. Park West Bank & Trust Co.,* 214 F.3d 213, 215-16 (1st Cir. 2000) (using Title VII case

law to find that cause of action existed under the Equal Credit Opportunity Act if defendant

refused to give a loan application to a cross-dressing male because his dress "did not accord with

his male gender."); *Schmedding v. Tnemec Co.*, 187 F.3d 862 (8th Cir. 1999) (holding that the

plaintiff had stated a Title VII claim where the harassment was intended to debase his

masculinity); *Doe v. Belleville*, 119 F.3d 563 (7th Cir. 1997) (holding that "Title VII does not

permit an employee to be treated adversely because his or her appearance or conduct does not

conform to stereotypical gender roles" and explaining that "a man who is harassed because his

voice is soft, his physique is slight, his hair long, or because in some other respect he exhibits his

masculinity in a way that does not meet his coworkers' idea of how men are to appear and

behave, is harassed 'because of his sex'"), *vacated and remanded on other grounds*, 523 U.S.

1001(1998).[9]

---

[9] *See also Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252 (1st Cir. 1999)
(acknowledging "[J]ust as a woman can ground an action on a claim that men discriminated
against her because she did not meet stereotyped expectations of femininity, . . . a man can
ground a claim on evidence that other men discriminated against him because he did not meet
stereotyped expectations of masculinity."); *Simonton v. Runyon*, 232 F.3d 33 (2nd Cir. 2000)

While the Tenth Circuit has not decided a case involving gender non-conforming

behavior under Title VII, a case involving a § 1983 claim by a transsexual plaintiff is instructive

on how it would rule. In *Brown v. Zavaras*, 63 F.3d 967 (10th Cir. 1995), a pre-operative, male-

to-female, transsexual inmate in a male prison made an Equal Protection Clause claim because

she was refused the provision of female hormones despite the fact that other inmates were

provided with hormones (post-operative transsexuals and inmates with low hormone levels).

The Tenth Circuit advocated re-evaluation of *Holloway* and its assumption that transsexual

individuals are not a suspect class because they cannot establish that transsexuality is "an

immutable characteristic determined solely by the accident of birth like race, or national origin."

*Id.* at 971 (internal quotations omitted). The Tenth Circuit recognized that there has been "recent

research concluding that sexual identity may be biological." *Id.* However, the court refused to

make such an evaluation in *Brown* because the allegations of Brown's Complaint were "too

conclusory to allow proper analysis" of that legal question. *Id.*

Another clear indication of Tenth Circuit's attitude on this issue is found in its

unpublished opinion of *James v. Platte River Steel Co., Inc.*, 2004 U.S. App. LEXIS 22157 (10th

Cir. 2004).[10] Sean James, a man, claimed that he was sexually harassed by a male co-worker.

Although the Court ultimately found that there was insufficient evidence that James was harassed

because he was a male, it referred to both *Bibby* and *Nichols* (cited above), and acknowledged

---

(noting that discrimination based on a failure to conform to gender norms might be cognizable
under Title VII).

[10] Tenth Circuit Rule 36.3 provides for citation of an unpublished decision if:
(1) it has persuasive value with respect to a material issue that has not been addressed in a
published opinion; and (2) it would assist the court in its disposition. A copy of this case is
attached hereto as "Exhibit L."

that a plaintiff can establish a sexual harassment claim under Title VII by showing that the

"harasser's conduct was motivated by a belief that the plaintiff did not conform to the stereotypes

of his or her gender." *Id.* at 8.

Federal district courts have also held that Title VII is violated when an employer

discriminates against an employee due to gender non-conformance. *See Centola v. Potter*, 183 F.

Supp. 2d 403 (D. Mass. 2002) (holding that Title VII prohibits harassment based on a perception

that a person does "not conform with their ideas about what 'real' men should look or act like");

*Heller v. Columbia Edgewater Country Club*, 195 F. Supp. 2d 1212, 1224 (D. Or. 2002) (holding

that Title VII prohibits harassment based on a perception that the person "did not conform to [the

defendant's] stereotype of how a woman ought to behave," and pointing out that the defendant

perceived the plaintiff to be gender non-conforming because the plaintiff "is attracted to and

dates other women, whereas [the defendant] believes that a woman should be attracted to and

date only men"); *Doe v. United Consumer Fin. Servs.*, U.S. Dist. LEXIS 25509 (N.D. Ohio

2001), attached as "Exhibit L", (held that while Doe's termination may have been because she

was transsexual, it may also have been because her appearance and behavior "did not meet

United Consumer's gender expectations.") *Tronetti v. TLC Healthnet Lakeshore Hosp.,*2003 U.S.

Dist. LEXIS 23757 (W.D.N.Y. 2003) attached as "Exhibit L" (holding that plaintiff was

protected under Title VII to the extent that they are discriminated against on the basis of sex for

failing to "act like a man").

The facts in *Doe*, U.S. Dist. LEXIS 25509, present salient similarities to the facts in this

case: Doe was a male-to-female transsexual who worked as a temporary for United Consumer,

which originally reported being satisfied with Doe's work.  However, when her co-employees

began to raise questions about Doe's sexuality, including a complaint that "a man dressed like a

9

women was using the ladies room," United Consumer did a unusually rigorous investigation into her background and eventually called her in and interrogated her about her name change and gender. She admitted that she was a transsexual female. The next day United Consumer refused to allow the temporary service to send Doe back to work there.

In determining that Doe had adequately pled a cause of action for gender discrimination under Title VII, the court held that Doe's allegations that United Consumer fired her because her appearance and behavior did not meet the company's sex stereotypes were sufficient. *Id.* at *9. In addition, the court used the following evidence to hold that while her termination may have been because she was transsexual, it may also have been because her appearance and behavior "did not meet United Consumer's gender expectations": 1) Doe's co-workers called her "Mrs. Doubtfire",[11] 2) management received a complaint of a man who was dressed as woman using the ladies room, and 3) management asked, "What gender are you? . . . Just looking at you I can't tell?" *Id.* at *12.[12]

Not only does case law establish that Title VII prohibits discrimination against those who are perceived to fall outside the confines of gender stereotypes, but the rationale underlying the courts' decisions is also compelling. In *Price Waterhouse* Justice Brennan explained how anti-discrimination laws seek a balance between employee rights and employer prerogatives, aiming to make qualifications and work performance the controlling factors. 490 U.S. at 238. Thus the test of an employee in the workplace is to measure the person against the job requirements, not the person in the abstract. As a New Jersey court reasoned, "Distinctions must be made on the

---

[11] A movie character played by actor Robin Williams dressed as a woman.

[12] In so holding, the court reasoned that a *Price Waterhouse* claim of non-conformity with gender norms would not automatically bootstrap protection for transsexuals into Title VII because "not all transsexuals appear less than 'fully male' or 'fully female.'" *Id.* at *15.

basis of merit, rather than skin color, age, sex or gender, or any other measure that obscures a person's individual humanity and worth." *Enriquez v. West Jersey Health Systems*, 777 A.2d 365, 380 (N.J. Super. 2001). In this case, there is no dispute that Etsitty had a spotless work record at UTA and was fully capable of performing her job. She was fired for gender-based characteristics that had absolutely no relevance to her job performance, abilities or qualifications. Employers should not be permitted to engage in this type of blatant sex-based discrimination without any liability under Title VII, the purpose of which is to prohibit such discrimination and to ensure that workplace decisions are based on merit and performance – not wether a bus driver is wearing lipstick or earrings or has a feminine demeanor.

## III.  ETSITTY WAS THE VICTIM OF UTA'S UNLAWFUL DISCRIMINATION

### A.  Defendants Admit That They Fired Etsitty Based on Gender Stereotypes Rather than on Anything to Do with Her Performance at Work Which They Acknowledge to Have Been Exemplary

Once the Court concludes that Etsitty is covered under Title VII (the "Act"), the next inquiry is whether she was terminated in violation of the Act. Discrimination can, of course, be proved by either direct or indirect (circumstantial) evidence. *United States Postal Services v. Aikens*, 460 U.S. 711, 714 n.3 (1983). Whether or not the Court resorts to the structure provided by the *McDonnell Douglas* framework,[13] the ultimate inquiry in a disparate treatment case such as this is really quite basic: Has the employer treated the complainant less favorably than others because of his/her race, color, religion, national origin, or sex? *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15 (1977). While discriminatory motive is

---

[13] Such an analysis is undertaken in the next section of this Memorandum. As will be discussed in that section, even under *McDonnell Douglas*, summary judgment is still warranted for the Plaintiff as the Defendants have not meet their burden by articulating a facially non-discriminatory reason for Plaintiff's discharge.

11

critical, such motivation can be inferred from the mere fact of different or disparate treatment. *Id.* Here, there is direct evidence of discrimination.[14] Defendants have admitted that they were motivated solely by Etsitty's gender non-conformity when they made the decision to terminate her employment. Therefore, as a matter of law, UTA's conduct violates Title VII.

Defendant Shirley, the operations manager over the UTA Meadowbrook facility, where Etsitty was assigned, first learned about Etsitty when she heard rumors that there was a male bus operator wearing makeup. (Statement of Facts ("SOF"), ¶ 43) Shortly thereafter, Shirley was approached by Etsitty's supervisor, Chatterton. Chatterton explained that he had been told by Etsitty that she was transsexual and would be dressing and appearing at work as a female. (SOF, ¶¶ 44, 46) Shirley immediately contacted Human Resources (specifically Bruce Cardon) and the two then met with Etsitty on February 15, 2002. (SOF, ¶¶ 51-52)

Shirley's testimony leaves no doubt that the purpose of this initial meeting was to confirm if Etsitty had been engaging in conduct not conforming to her anatomical gender, male. They opened the meeting by questioning Etsitty about what the term "transgender" meant and then followed it up with questions about Etsitty's own sexuality and biological structure. (SOF, ¶¶ 52, 54) However, even discounting Etsitty's testimony (which has not yet been disputed), UTA's discriminatory motivation is not in doubt. Shirley, the person who decided to terminate Etsitty, admits that both she and Cardon believed and discussed that Etsitty presented an image issue for UTA, "that we could have a problem with having someone who, even though his appearance may look female, he's still a male . . ." (SOF, ¶ 94) Similarly, Cardon testified that he believed

---

[14] The U.S. Supreme Court has held that the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination. *Trans World Airlines v. Thurston*, 469 U.S. 111, 121 (1985).

that Etsitty presented a serious image problem for UTA based on her failure to meet UTA's

gender stereotypes about how men and women should dress and appear:

> We have expectations of operators and how they appear to the public. Those
> expectations are pretty broadly defined, but if we see something that is considered
> radical or could be interpreted by the public as being inappropriate . . . [they have
> to be changed].

(SOF, ¶ 59)

Both Shirley and Cardon's testimonies are so straight-forward that it is difficult to explain

any more clearly than they have as to their concern about Etsitty's gender non-conforming

behavior and appearance. Both emphasize that Etsitty, by exhibiting a "female" appearance,

presented a problem for UTA. They then further explain, in slightly different ways, that the

reason Etsitty was a problem was because she was an anatomical man who presented and dressed

as a woman. Shirley says this directly, "[W]e could have a problem with having someone who,

even though his appearance may look female, he's still a male . . . ." (SOF, ¶ 58)  Cardon's

statement expands on this by contending that Etsitty's appearance was "radical" and

"inappropriate." (SOF, ¶ 59)

In summary, because Etsitty was a biological or anatomical male who did not conform to

UTA's stereotypical gender expectations by dressing and presenting as a female, Etsitty was a

"problem." Because of this "problem," Shirley felt that Etsitty was a "liability for UTA" and

terminated her employment. Just as in *Gerdon v. Continental Airlines*, 692 F.2d 602, 609 (9th

Cir. 1982), *cert. denied*, 460 U.S. 1074 (1983), "the difficulty with the justification, therefore, is

that it is not neutral. It is discriminatory on its face . . . ."[15]

---

[15] In *Gerdon*, the court was referring to Continental's justification for its weight limit for
flight attendants which it asserted was a "desire to compete by featuring attractive female cabin
attendants." The court said that, "subsumed in its assertion is the view that, to be attractive, a
female may not exceed a fixed weight." *Id.* at 609.

Shirley's testimony is an admission that Etsitty was fired for engaging in gender non-conforming conduct, which, as discussed in Section II., is considered gender discrimination under Title VII. Thus, as a matter of law, UTA violated Title VII because it fired Etsitty for failing to conform to its stereotypical gender expectations. *Price Waterhouse*, 490 U.S. at 282.[16]

## B.  The Circumstantial Evidence Also Shows UTA Fired Etsitty Solely Because of Her Perceived Gender Non-conformity

The admissions of Shirley and Cardon are fully supported by and consistent with what might be described as "circumstantial evidence." The U.S. Supreme Court recently held that a plaintiff can prove her discrimination case by using direct or circumstantial evidence and that "circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003)(quotations and citations omitted).[17] In this case, the circumstantial evidence points in only one direction: that Etsitty's failure to live up to UTA's gender stereotypes about how an anatomically male person should behave and appear was the sole reason for her termination.

---

[16] Any argument by Defendants that the problem was not the gender non-conforming conduct but Etsitty's restroom usage is specious at best. As discussed in Section IV., which restroom Etsitty used was direct and inexorably linked to her gender non-conforming conduct. As someone who was dressing and appearing as a female, she would have to use a woman's restroom (otherwise there would surely be complaints). Accordingly, using the "restroom" as an excuse in a case like this is no different than firing a Muslim woman and arguing that her religion had nothing to do with it because she was simply being fired for covering her head.

[17] In *Desert Palace* the Supreme Court found minimal evidence was sufficient to show circumstantial evidence of discrimination supporting a jury instruction that an impermissible factor, gender, had motivated the employer. *Id. at 95*. Here, the facts are subject to but one interpretation: It was Etsitty's non-conforming conduct, and nothing else, that led directly to her dismissal. Further, UTA's attempt to argue that it was not Etsitty's gender non-conformity which prompted termination, but rather restroom use is of no avail, because it would not have been an issue, but for the fact that she was an anatomical male engaging in gender non-conforming conduct. As a transsexual she had to use woman's restroom. Accordingly, referring to restroom usage is not a non-discriminatory reason for the termination, but rather reenforcement of the discriminatory intent.

14

There were absolutely no problems or concerns about Etsitty's job performance. Etsitty was hired in the Fall of 2001, and successfully completed the twelve week training course. (SOF, ¶ 23) She was then put on the extra-board, Chatterton became her supervisor, and she started filling in for the regularly scheduled drivers. (SOF, ¶ 24) During the time she was on the extra-board she drove numerous different routes during which time there was absolutely nothing amiss -- no problems, disputes, accidents, tardies, or absences; not even a wrong turn. (SOF, ¶¶ 34-37) Her supervisor Chatterton describes Etsitty as a good bus driver. (SOF, ¶ 34) At no time was Etsitty ever disciplined. (SOF, ¶ 35) Shirley, who terminated Etsitty acknowledges that there were no performance issues and that performance had nothing to do with her termination. (SOF, ¶ 37)

There also had been no complaints about Etsitty. None from any UTA employee. (SOF, ¶ 30) None from her supervisors. (SOF, ¶ 30) None from any UTA customers. (SOF, ¶ 31) None from any business owners. (SOF, ¶ 32) Further, there were no complaints about Etsitty's appearance and no complaints about Etsitty's restroom usage. (SOF, ¶¶ 29-33) In brief, at the time of her termination, Etsitty's employment record with UTA was totally unblemished. She was well on her way to a long, successful career at UTA.

However, this success was derailed when UTA discovered that Etsitty was engaging in gender non-conforming conduct. Once Etsitty was officially placed on the extra-board and began driving regular bus routes (after successfully completing the training), she began to appear more feminine at work. (SOF, ¶ 42) For example, she began to wear make-up, to wear earrings, to polish her fingernails, and to ear a name patch that read "Krystal," a traditionally female name as opposed to her former "male" name of "Michael." (SOF, ¶¶ 41-42) This conduct first came to Shirley's attention through "the rumor mill." (SOF, ¶ 43) Etsitty had also confided in her direct

15

supervisor, Pat Chatterton, that she was a pre-operative transsexual, whose treatment demanded that she live as a woman and appear more feminine at work.[18] (SOF, ¶ 44) Etsitty talked to Chatterton frankly in an attempt to be sensitive to her employer's anticipated concerns regarding her appearance. (SOF, ¶ 44) Chatterton was supportive and did not raise <u>any</u> concerns with Etsitty regarding her appearance, conduct, status as a transsexual or her ability to be a bus dirver. (SOF, ¶ 45)  However, he did feel that he should report what he had been told by Etsitty to his supervisor, Shirley. (SOF, ¶¶ 46, 48 )

It was Shirley's and Human Resources' concern that Etsitty was not conforming to their ideas of masculinity which led directly to the termination. After the report from Chatterton, Shirley immediately called Cardon in HR and they set up a meeting with Etsitty.  At that meeting they quizzed Etsitty about her gender and her sex organs.  Etsitty was then suspended.  Both Cardon and Shirley testified that they believed Etsitty presented an "image problem" because she was a "man posing as a woman."  Etsitty was terminated within a few days of Shirley's initial conversation with Chatterton.  During the intervening period, Etsitty did <u>nothing</u> to warrant termination; there were no incidents or complaints about her.  Even absent Defendants' admissions (as discussed above), the circumstantial evidence (the timing of the termination, together with the absence of any problems or complaints), leads to only one logical conclusion: Defendants terminated Etsitty because she did not conform to pre-conceived stereotypes about her gender.  This Court can, and should, therefore conclude that as a matter of law, UTA's actions violate Title VII and that because of the absence of mitigating or non-discriminatory reasons, Etsitty is entitled to the full panoply of remedies available under that Act.

---

[18] Defendants admit to this change in Etsitty's appearance: "towards the end of his employment, plaintiff began to take steps to appear more like a female." (Defendants' Answer, ¶ 20 attached as "Exhibit H".)

**IV.    UNDER THE *MCDONNELL DOUGLAS* BURDEN SHIFTING ANALYSIS, UTA CANNOT MEET ITS BURDEN.**

Even if the Court does not apply the above standards (of direct and/or circumstantial evidence) to find that UTA illegally discriminated against Etsitty, she is still entitled to summary judgment under the *McDonnell Douglas* burden shifting approach. This framework is well established. *EEOC v. Flasher Co.*, 986 F.2d 1312 (10th Cir. 1992). The plaintiff is first required to prove a prima facie case of discrimination. Then, the burden shifts to defendant to articulate a facially non-discriminatory reason for the termination. *Id.* at 1316. Finally the plaintiff must then show that the articulated reason was false or untrue. *St. Mary's Honor Ctr v. Hicks*, 509 U.S. 502 (1993).

In order to established a prima facie case of discrimination, Etsitty must show: 1) she is a member of a protected class; 2) she was qualified for the job; 3) despite that qualification she was discharged; and 4) after her discharge the job remained available.  *See Lujan v. New Mexico Health & Social Servs. Dep't*, 624 F.2d 968, 970 (10th Cir. 1980)( *citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). "The burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dep't. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

As set forth above in Section II, Etsitty is a member of a protected class (*i.e.*, a biological male engaging in gender non-conforming conduct).  Further, there is no question that Etsitty was qualified for the job -- she was hired into the training program, which she successfully completed, and was hired as an employee on December 6, 2001. (SOF, ¶¶ 23-24)  She was performing her job duties satisfactorily and there were <u>no</u> performance issues with Etsitty. (SOF, ¶ 37  Despite this, Etsitty was terminated on February 18, 2001. (SOF, ¶ 60)  Since her

termination, UTA has continued to hire bus operators. (SOF, ¶ 77) . Therefore, Etsitty has demonstrated a prima facie case of discrimination.

Once Etsitty meets this initial burden, a rebuttable presumption of unlawful discrimination is created. *Burdine*, 450 U.S. at 254 ("The prima facie case serves an important function in the litigation: it eliminates the most common non-discriminatory reasons for the plaintiff's rejection."). The burden then shifts to UTA to rebut this presumption of discrimination and come forward to show that it terminated Etistty for a legitimate and non-discriminatory reason. *Hickman v. Flood & Peterson Ins., Inc.*, 766 F.2d 422, 424 (10th Cir. 1985). If UTA cannot make such a showing, then judgment should be entered as a matter of law for Etsitty. *Considine v. Newspaper Agency Corp.*, 43 F.3d 1349 (10th Cir. 1994).

As set forth further below, UTA cannot show that its proffered reason for terminating Etsitty was either legitimate and non-discriminatory or that it was a bona fide occupational qualification ("BFOQ"). Therefore, Etsitty is entitled to summary judgment.

### A.    UTA's Proffered Reason for Terminating Etsitty Does Not Constitute a "Legitimate and Non-discriminatory" Reason

The undisputed facts show that Plaintiff has met her burden of making out a *prima facie* case of discrimination. Therefore, under the *McDonnell Douglas* burden shifting framework, the Defendants must articulate a non-discriminatory and legitimate reason why they fired Etsitty. *Anaeme v. Diagnosteck, Inc.*, 164 F.3d 1275, 1278 (10th Cir. 1999). Granted, the burden placed on the Defendants is not great. *Id.* at 1279. However, the explanation provided must be <u>legally</u> <u>sufficient</u> to justify judgment for the defendant. *Burdine*, 450 U.S. at 255-56; *McCowan v. Allstar Maint., Inc.*, 273 F.3d 917, 922 (10th Cir. 2001). Thus, although this evidence "need not persuade the trial court that the defendants were actually motivated by the proffered reasons," it has to raise a genuine issue of fact as to whether they discriminated against Etsitty. *EEOC v.*

18

*Wyoming Retirement System*, 771 F.2d 1425, 1429 (10th Cir. 1985). Further, the articulated

reason for the action must be reasonably specific and clear, and must be <u>facially non-</u>

<u>discriminatory</u>. *Considine*, 43 F.3d at 1363. Although defendants are usually able to meet this

burden, there are cases were they have not.[19] It is clear that if a defendant cannot articulate a

facially neutral reason for firing plaintiff, then the Court must award judgment to the plaintiff as

a matter of law. *Considine*, at 1363.

Here, Defendants assert several affirmative defenses contending that their reason for

terminating Etsitty was "legitimate," "reasonable," in "good faith," *etc. See* Defendants' Answer,

"Exhibit H," Affirmative Defenses 14-18, p 8. However, the only reason given for discharging

Plaintiff was UTA's alleged concern that "plaintiff's choice of restrooms could put UTA at risk

of a lawsuit by customers or employees."[20] This reason cannot, and does not, qualify as a facially

non-discriminatory reason. In *Cruzan v. Special School District, # 1*, 294 F.3d 981, 984 (8th Cir.

2002), the Eighth Circuit held that the district's policy allowing Davis (a male-to-female

---

[19] For example, in *Impact v. Firestone*, 893 F.2d 1189, 1194 (11th Cir. 1990) defendants
contended, relying solely on the testimony of the HR director, that they hired the "best qualified"
individuals. However there were no specifics offered as to who actually made the decision nor
the basis for this decision. The court found that the defendants had not met their burden of
providing a non-discriminatory reason for the refusal to hire. Similarly, in *Eccleston v. Secretary
of the Navy*, 700 F. Supp. 67, 71 (D.D.C. 1988), the court found that the employer's reason for
the hiring decision, a "gut feeling," was not sufficient to satisfy its burden. Finally, in *Prudencio
v. Runyon,* 986 F. Supp. 343, 350 (W.D.Va. 1997), the court held that the defendant could not
simply say that the reason it did not hire the plaintiffs was because their names were dropped
from the applicant role by a computer error. Rather, they were required to explain why or how
the computer error occurred. *Id.*

[20] At certain points in the development of this matter UTA has contended that Etsitty was
also fired for falsifying her application. This reason was rejected by the decision maker, Shirley,
in her deposition. Shirley testified that she made the decision to terminate Etsitty because of her
alleged concern about UTA liability and <u>not</u> because of what was on Etsitty's application.
Shirley admitted that she never even looked at Etsitty's application. (Shirley Dep. at 120, 135
attached as "Exhibit C")

19

transsexual) to use the women's restroom did not create a hostile working environment stating

that "a reasonable person would not have found the work environment hostile or abusive."[21]  As

further explained below, the fear that other employees or the public will be biased against a

transsexual worker or will be offended by having to share a restroom with a transsexual person is

neither neutral nor legitimate.[22]

Where an "employer cannot state a legitimate non-discriminatory reason to rebut a

plaintiff's prima facie case . . . discrimination has been established as a matter of law based on

the plaintiff's initial showing." *Gerdon* 692 F.2d at 609 *citing Muntin v. State of Cal. Parks and

Recreation Dept.*, 671 F.2d 360, 362 (9th Cir. 1982); *Wyoming Retirement System*, 771 F.2d at

1429 (court found that the evidence presented by defendants was not sufficient to show a

legitimate, non-discriminatory reason and therefore found in plaintiff's favor).

---

[21]  Further Etsitty's choice of a restroom is inexorably linked with her status as a
transsexual.  Before an individual can qualify for surgery to alter their sexual anatomy, they must
live as a member of the opposite sex for at least a one year period.  Therefore, Etsitty must dress,
act and otherwise live as a female before she undergoes the surgical procedure, which includes, *a
priori*, using women's restroom (if a single-use restroom is not available).  In short, part of her
gender non-conforming conduct is using a restroom belonging to her appropriate "gender
identity."  Therefore, firing a transsexual over alleged worries about her using female restrooms
is nothing more, nor less, than discriminating against her because of her gender non-conforming
conduct.

[22]  Firing someone for an inherent trait, or as in this case for their inherent behavior, can
never be facially non-discriminatory.  For example, firing an African-American employee and
then contending it is not because of his race, but because he refused to comply with the
company's shaving requirement because he suffered from pseudo follicle barbae (inflamation of
the hair follicles - a condition affecting 50% of African American males) is the same as firing
him because of his race.  *Bradley v. Pizzaco of Nebraska, Inc.*, 7 F.3d 795, 798-99 (8th Cir. 1993).
Or firing an Orthodox Jew (who is not allowed by their religion to work on Saturdays) for not
working on Saturday is not a legitimate, non-discriminatory reason as his conduct is an integral
part of his religion.  *See Thomas v. National Ass'n of Letter Carriers*, 225 F. 3d 1149 (10th Cir.
2000).

20

Here, UTA's articulated reason -- concern about Etsitty's restroom usage -- is not a legitimate non-discriminatory reason because the restroom usage is part of the gender non-conforming behavior that Etsitty engaged in. Indeed, UTA's articulated reason is really an admission that it was firing Etsitty because of her gender non-conforming conduct. A plaintiff in a discrimination case can prevail by "directly proving that the employer acted with a discriminatory motive." *Flasher Co.*, 986 F.2d at 1317. Here, the very reason set forth by Defendants is further direct evidence (*see* Section II. above as well) that the firing of Etsitty was discriminatory, and judgment should be entered in her favor as a matter of law.

### B.  UTA Cannot Raise a Genuine Issue of Fact That Restroom Choice Is a BFOQ

Defendants' Fourth Affirmative Defense states, "choice of restroom facilities is a bona fide occupational qualification for his position." *See*, Defendants' Answer, p. 6 attached as "Exhibit H." The BFOQ defense is a narrow exception to Title VII's prohibition of sex discrimination. *Int'l Union, United Auto, etc. v. Johnson Controls*, 499 U.S. 187, 201 (1991); *see also*, 29 CFR § 1604.2(a) ("the commission believes that the bona fide occupational qualification exception as to sex should be interpreted narrowly.")

The U.S. Supreme Court has made it clear that any gender-based job classification must relate to the "essence" or "central mission" of the employer's business. *Johnson Controls* at 203. There is no question that Etsitty's biological gender or status as a transsexual (or as UTA states, her "choice of restroom facilities"), does not impact her ability to perform her job duties nor does it relate to UTA's essence or central mission. UTA has not, and cannot, argue that Etsitty's gender or her status as a transsexual impacted her ability to drive a bus. It is undisputed that there were no performance concerns with regard to Etsitty and her ability to drive UTA's buses. (SOF, ¶ 37) Additionally, as further set forth below in Section V., UTA handled complaints

about other bus operators' use of restrooms (*i.e.*, leaving such restrooms in a messy condition) in

a much different manner. Instead of firing or even disciplining these operators, UTA merely

directed them to refrain from using those particular restrooms. (SOF, ¶¶ 73, 76) Thus, UTA

cannot show, under any set of facts that its stated BFOQ, which restrooms Etsitty used, impacts

its "essence" or "central missions."

Additionally, 29 CFR § 1604.2(a)(1)(iii), specifically prohibits an employer from using a

sex-based BFOQ in several situations, including: "The refusal to hire an individual because of

the <u>preferences of coworkers, the employer, clients or customers</u> . . . ." (emphasis added). UTA's

stated justification for terminating Etsitty was that they were concerned about her restroom use in

that it may cause a customer, or member of the public-at-large, to file a complaint. *See* Answer,

¶ 24 attached as "Exhibit H." As explained in *Gerdon*, 692 F.2d at 609, where the court analyzed

Continental's strict flight attendant weight requirement as justification for only hiring female

flight attendants, "to the extent the justification was based upon "consumer preference . . . such a

justification must fail." The court emphasized that:

> While we recognize that the public's expectation of finding one sex in a particular
> role may cause some initial difficulty, **it would be totally anomalous if we were**
> **to allow the preferences and prejudices of the customers to determine**
> **whether the sex discrimination was valid.** Indeed, it was, to a large extent, these
> very prejudices the Act was meant to overcome.

*Id. quoting Diaz v. Pan American World Airways, Inc.*, 442 F.2d 385, 389 (5th Cir.), *cert. denied*,

404 U.S. 950 (1971)(emphasis added). Defendants' concerns with Etsitty revolved around the

projected "preferences and prejudices" of its customers. Shirley testified that she and Cardon

"both felt that there was an image issue out there for us, that we could have a problem with

having someone who, even though his appearance may look female, he's still a male because he

still had a penis." (SOF, ¶ 58) Cardon echoed this concern when he testified that:

22

We have expectations of operators and how they appear to the public. Those expectations are pretty broadly defined, but if we see something that is considered radical or could be interpreted by the public as being inappropriate, we talk to the operators about that and expect them to a have a professional appearance.

(SOF, ¶ 59) Further, during her termination, Etistty was told that, UTA was concerned "that plaintiff's choice of restrooms could put UTA at risk of a lawsuit by customers or employees." Defendants' Answer, ¶ 24, attached as "Exhibit H". UTA simply cannot rely on customer preferences to justify its termination of Etsitty.

Under *Johnson Controls* and the cases following, a BFOQ must go to the "essential" functions of an employer's business, which, as set forth above, is not the case here. Moreover, it is clear that a BFOQ cannot be based upon customer preferences. Thus, UTA is prohibited from relying upon an <u>assumed</u> risk that Etsitty, her appearance, and/or her use of female restrooms, would offend a customer or employee to establish a BFOQ. UTA cannot point to any facts to support a BFOQ.

Because UTA cannot articulate a legitimate and non-discriminatory reason for terminating Etsitty, nor can it support its asserted BFOQ, Etsitty is entitled to summary judgment.

## V.   EVEN IF UTA'S REASON IS "LEGITIMATE AND NON-DISCRIMINATORY," IT IS NOTHING BUT PRETEXT

Assuming the Court were to determine that UTA's rationale for firing Etsitty was "legitimate and non-discriminatory," the undisputed facts show that its explanation is pretextual and unworthy of belief.

Pretext can be proven either "directly by persuading the court that discriminatory reasons more than likely motivated the employer, or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Beck v. Quicktrip Corp.*, 708 F.2d 532, 535 (10th Cir.

1983); *Bocage v. Litton Systems, Inc.*, 702 F. Supp. 846 (Utah 1988). A plaintiff can show pretext indirectly by revealing, "Such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations omitted).

As set forth above in Section III., the undisputed facts show that UTA's decision to terminate Etsitty was more likely than not motivated by discrimination (*i.e.*, direct evidence of pretext). Specifically, both Shirley and Cardon testified that their concerns, which led them to terminate Etsitty, were based upon Etsitty's gender non-conforming conduct and appearance. Both emphasize that Etsitty, by exhibiting a "female" appearance, presented a problem for UTA. Shirley says this directly ". . . we could have a problem with having someone who, even though his appearance may look female, he's still a male . . . ." (SOF, ¶ 58) Cardon's statement expands on this by contending that Etsitty's appearance was "radical" and "inappropriate." (SOF, ¶ 59) In summary, because Etsitty was a biological/anatomical male who engaged in gender non-conformity – dressing and presenting as a female – which did not meet UTA's stereotypical gender expectations, Etsitty was a "problem." Because of this "problem," Shirley felt that Etsitty was a "liability for UTA" and terminated her employment. These admissions show pretext (that discriminatory reasons more than likely motivated UTA in terminating Etsitty).

In the alternative, the undisputed facts show that UTA's reason for terminating Etsitty is "unworthy of credence" (*i.e.*, indirect evidence of pretext). First, it is undisputed that Etsitty was performing her job in a satisfactory manner and that her performance had no role in the decision to fire her. (SOF, ¶¶ 36-37) It is also undisputed that UTA never received any complaints about

Etsitty from any UTA employees, UTA customers or people who rode the bus, any business owners, nor anyone in the public. (SOF, ¶ 29)  In fact, at no time did UTA ever receive a complaint about Etsitty, or her appearance, from anyone. (SOF, ¶ 33)

Second, at the termination meeting Shirley told Etsitty that they were releasing her from UTA because "[UTA] could not accommodate restroom needs." (SOF, ¶ 61)  However, although UTA professes concern about Etsitty's use of restrooms, no attempts were made to determine whether there was nay factual (or legal) basis for this alleged concern. (SOF, ¶¶ 69-72)  "An employer's lack of inquiry into the validity of its reason for terminating an employee may show its belief in the validity of that reason was incredible," and merely pretext for discrimination. *Whalen v. United Airlines Inc.*, 1992 US App LEXIS 17641 (10th Cir. 1992), attached as "Exhibit L," (citing *Bechold v. IGW Sys., Inc.*, 817 F.2d 1282, 1285 (7th Cir. 1987)).

Shirley made no inquiries to determine if anyone might be offended to share a restroom with a transsexual individual. (SOF, ¶ 69)  UTA also never investigated whether Etsitty's routes had any complaints about Etsitty's restroom usage when she was driving those routes. (SOF, ¶ 70)  Nor did UTA check to see what type of restrooms (*i.e.*- single or unisex) were available to Etsitty on her routes, although UTA had an employee whose job it was to find restrooms for operators to use when driving. (SOF, ¶ 71)  Additionally, UTA could have, but did not, direct Etsitty to use only facilities that had one toilet or that were uni-sexed (this would have insured that Etsitty's use of the restroom did not arouse any concerns or suspicion.)  UTA also did not speak with any of Etsitty's former employers regarding her use of restrooms or whether there had been any complaints about her usage. (SOF, ¶ 72)  Simply put, UTA made absolutely no attempt to determine if there was an validation to it alleged concern about "accommodating" her

25

restroom use. Thus, UTA's explanation that it was "unable to accommodate" Etsitty's restroom needs is incredible and unworthy of credence, instead it simply pretext for her termination.

Third, Etsitty was treated differently from those bus operators who UTA received actual complaints about with regard their restroom while they were on duty. Differential treatment of similarly-situated employees also supports a finding of pretext. *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1199 (10th Cir. 2000) *citing McDonnell Douglas*, 411 U.S. at 804. Shirley received complaints from two hotels about UTA operators leaving their restroom facilities a mess. (SOF, ¶¶ 73-75) Instead of firing those operators, Shirley simply directed the operators not to use the restrooms at those hotels, without even so much as a disciplinary note or verbal warning. (SOF, ¶ 76) In contrast, prior to even receiving an actual complaint about Etsitty's restroom use, Shirley terminated her (without attempting any accommodations as explained above).

Based on the above undisputed direct and circumstantial evidence, UTA's proffered explanation for firing Etsitty is merely pretext for discrimination. While a finding of pretext does not always necessitate a finding that the employer discriminated, *see Flasher Co.*, 986 F.2d 1312, it does in this case. This is because in addition to pretext, there is direct evidence that Defendants were motivate in their decision by Etsitty's gender non-conforming behavior. *See* Section III., above. Since UTA's only possible "non-discriminatory" reason is insufficient, and there is direct evidence of discriminatory intent, judgment as a matter of law for Etsitty is appropriate.

**VI.    ETSITTY IS ENTITLED TO SUMMARY JUDGMENT ON HER EQUAL PROTECTION CLAIMS AGAINST DEFENDANTS**

Etsitty has also brought a claim against both UTA and Shirley under 42 U.S.C. § 1983. A public employee's right to be free from discrimination at work on the basis of sex is protected by

the Equal Protection Clause of the Fourteenth Amendment. *Davis v. Passman*, 442 U.S. 228

(1979); *Smith v. City of Salem, Ohio*, 378 F.3d 566 (6th Cir. 2004); *Gossett v. State of Oklahoma*,

245 F.3d 1172 (10th Cir. 2001); *Verna Lewis v. City of Ft. Collins*, 903 F.2d 752 (10th Cir. 1990).

As set forth in footnote 27, the elements of Etsitty's Section 1983 case are the same as those

outlined in *McDonnell Douglas*.  *Randle v. City of Aurora*, 69 F.3d 441, 450 (10th Cir. 1995);

*Drake v. City of Fort Collins*, 927 F.2d 1156, 1162 (10th Cir. 1991).  The only additional

requirement for UTA to be held liable under Section 1983 is that the official engaged in the

allegedly discriminatory action (*i.e.,* in this case the termination) is a final policymaker.[23]

*Randle* at 1162.

The Tenth Circuit has adopted a three part or element test to determine if an individual is

a "final policymaker:"

> 1) whether the official is meaningfully constrained "by policies not
> of that official's own making;" 2) whether the official's decision
> are [sic] final -- *i.e.,* are they subject to any meaningful review; and
> 3) whether the policy decision purportedly made by the official is
> within the realm of the official's grant of authority.

*Id.* at 448.  Here there can be no doubt that the decision maker, Shirley, was a "final

policymaker."  Her actions were not constrained or limited by any policy or procedure.  (SOF, ¶¶

62-63)  Second, her decision was not reviewable as Etsitty was a probationary employee and

therefore could not use the grievance process.  (SOF, ¶¶ 63-64)  Third, it is not disputed that the

decision to terminate Etsitty was squarely within Shirley's purview and duties.  (SOF, ¶ 62)

While Shirley consulted with Human Resources, she, and she alone, had the authority to

terminate Etsitty.  She did not have to obtain approval from anyone at UTA before making the

---

[23] UTA would also be liable if the official acted pursuant to a custom or policy. *Randle* at
447.  It is not necessary to determine if there was a discriminatory custom or policy as Shirley
was the final policymaker.

decision.  Accordingly, UTA should also be found liable under 42 U.S.C. § 1983 for the unlawful discrimination suffered by Etsitty.

Shirley is also liable in her individual capacity, under § 1983, for the discrimination suffered by Etsitty as she was personally involved in the discriminatory action - *i.e.*, the termination. *Foote v. Spiegel and Howe*, 118 F.3d 1416,1423 (10th Cir. 1997); *Woodward v. Butler*, 977 F.2d 1392, 1400 (10th Cir. 1992).

**VII.   AS AN ALTERNATIVE TO HOLDING THAT ETSITTY IS PROTECTED UNDER TITLE VII FOR ENGAGING IN GENDER NON-CONFORMING CONDUCT, ETSITTY IS ALSO PROTECTED BECAUSE OF HER STATUS AS A TRANSSEXUALS AND/OR HER "BIOLOGICAL SEX."**

In addition to holding that transsexuals must be protected from discrimination based on gender stereotypes, several courts also have held that discriminating against a person simply because he or she is a transsexual is discrimination on the basis of sex.  Granted, most courts have not taken this step, asserting that the term "sex" in Title VII refers only to an individual's biological or anatomical features, and not to their sexual identity or "gender."  *See Enriquez v. West Jersey Health*, 777 A.2d 365 (N.J. Sup. Ct. 2001), and the cases cited therein.

However, this narrow definition of the term "sex' has been rejected by several state courts.  For example, in *Maffei v. Kolaeton Industry, Inc.*, 626 N.Y.S.2d 391 (N.Y. Sup. Ct. 1995), the plaintiff, Daniel Maffei, was a female-to-male transsexual.  Prior to undergoing sex-reassignment, Maffei was considered to be an exemplary employee who "executed his duties in a stellar fashion, was frequently praised about his work performance and received salary increases on a regular basis."  After he began treatment for sex reassignment, however, the employer subjected him to a campaign of harassment and isolation, including openly berating him for being transsexual.  The court held that "the creation of a hostile work environment . . . relating to the fact that . . . an employee changed his or her sexual status creates discrimination based on

28

'sex,' just as would comments based on the secondary sex characteristics of a person." *Id.* at 396.

Similarly, in *Rentos v. OCE-Office Systems*, 1996 U.S. Dist. LEXIS 19060, at *8 (S.D.N.Y. Dec. 24, 1996), attached as "Exhibit L," the plaintiff was subjected to a hostile work environment almost immediately after her employer learned of her transsexual status.  She also "became the target of vicious jokes and comments 'about her sex background and subsequent change'" at a company management conference. *Id.*  The court denied the employer's motion to dismiss and rejected the employer's attempted reliance on the analysis in *Ulane* as outdated and unpersuasive. *Id.*

The Superior Court of New Jersey studied the trend of gender protection under both federal and state law in its decision in *Enriquez*, 777 A.2d 365.  In that case, the court held that a doctor who had gender identity dysphoria and was transitioning from a male to a female had a cause of action for sex discrimination under New Jersey Law Against Discrimination when she was terminated from her job as medical director from a learning behavior center.  In reviewing decisions that went the other way, the New Jersey court commented, "The view of sex discrimination reflected [by these courts] is too constricted."

Given the above case law, in addition to finding that Etsitty is protected against discrimination under Title VII for engaging in gender non-conforming conduct, this Court should also find that Etsitty is protected under Title VII simply because of her status as a transsexual (as opposed to her appearance or conduct).  As the court in *Enriquez* discusses, the Supreme Court in *Price Waterhouse* held that Title VII barred discrimination against a women who failed to act like a woman.  In other words, Title VII prohibits discrimination when someone does not act in accordance with their biological sex.  The Supreme Court in *Price Waterhouse* implicitly recognized that the definition of "sex" encompasses the meaning of "gender." *Enriquez, 777*

29

A.2d 371-72. It would make sense, therefore, to also find that discrimination against a person because of his/her status as transsexual (which relates to their "gender identity") is barred. *Id.* at 373. This more expansive view of the meaning of the term "sex" is certainly not inconsistent with the legislative history behind Title VII.[24]

Thus, under a broad application of Title VII, which has been encouraged by the U.S. Supreme Court, Etsitty should be protected for both engaging in gender non-conforming conduct, as well as for being transsexual.[25]

## CONCLUSION

For the reasons set forth above, this Court should grant Plaintiff's Motion for Summary Judgment, finding that, in the least, 1) gender non-conforming conduct is protected under Title VII and the Equal Protection Clause, and that 2) Etsitty was fired for engaging in such protected conduct.

---

[24] As discussed in: *Schwenk and the Ambiguity in Federal "Sex" Discrimination Jurisprudence: Defining Sex Discrimination Dynamically under Title VII*, 25 Seattle Univ. L.R. 255, 278 (2001), there is no evidence that Congress intended the term "sex" to refer only to biological male or biological female. Since there is no legislative history specifically addressing this issue, the term "sex" must be construed "liberally, in a manner consistent with the underlying statutory purposes." *Id.* at 279; *see also Price Waterhouse*, 490 U.S. at 251 (It was Congress' intent to "strike at the entire spectrum of disparate treatment of men and women . . . ." )

[25] This Court could also conclude that the actions taken against Etsitty were do to her biological sex and therefore prohibited by Title VII coverage of (biological) sex discrimination. The first thing that Shirley and Cardon asked Etsitty, when they met with her, was the status of her sex organs. It is hard to imagine a question which more directly goes to someone's anatomical sex. Further, after Etsitty was fired, UTA and Shirley stated that Etsitty was eligible for rehire after she went through surgery to remove her male sex organs. (SOF, ¶ 65) It is hard to see how firing Etsitty for having a penis, is not discriminating against Etsitty based on her biological sex in violation of Title VII.

Dated this 16th day of March, 2005

**STRINDBERG SCHOLNICK & CHAMNESS, LLC**

Erik Strindberg
Erika Birch
Attorneys for Plaintiff

## INDEX TO EXHIBITS

**Exhibit A:**     **The Affidavit of Dr. Walter J. Meyer III**

**Exhibit B:**     **Excerpts from the Deposition of Krystal Etsitty**

**Exhibit C:**     **Excerpts from the Deposition of Betty Shirley**

**Exhibit D:**     **Excerpts from the Deposition of Pat Chatterton**

**Exhibit E:**     **Excerpts from the Deposition of Bruce Cardon**

**Exhibit F:**     **Excerpts from the Deposition of Jerry Benson**

**Exhibit G:**     **Deposition Exhibits as referenced**

**Exhibit H:**     **Defendants' Answer to Amended Complaint**

**Exhibit I:**     **Defendants' Response Plaintiff's First Set of Written Discovery**

**Exhibit J:**     **Defendant's Response to Plaintiff's Second Set Of Written Discovery**

**Exhibit K:**     **Defendants' Responses to Plaintiff's Fourth Set of Written Discovery**

**Exhibit L:**     **Unpublished Cases as referenced**

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing **PLAINTIFF'S**

**MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

to be sent  via hand-delivery this _____ day of March, 2005 to:

Scott A. Hagen
Michael E Blue
Ray Quinney & Nebeker
36 South State Street #1400
P. O. Box 45385
Salt Lake City, Utah 84145-0385

33