THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| KRYSTAL ETSITTY,         )  | |
|           Plaintiff,          )  | Case No. 2:04CV616 DS |
| vs.                              )  | |
|                                      )  | ORDER |
| UTAH TRANSIT AUTHORITY, et al.,  | |
|                                      )  | |
|           Defendant.          )  | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I.  INTRODUCTION

Plaintiff Etsitty filed suit against her former employer, Utah Transit Authority (UTA) and Betty Shirley, Director of Operations (Ms. Shirley), alleging that the Defendants terminated her employment on the basis of her gender non-conforming conduct and/or her status as a transsexual, in violation of Title VII and the Equal Protection Clause of the United States Constitution.  Each party has filed a Motion for Summary Judgment, both of which are now fully briefed.

## II.  FACTUAL BACKGROUND

The relevant facts of the case are straightforward and basically undisputed.  Plaintiff is a transsexual who has been diagnosed with "Gender Identity Disorder."  From the time she was a small child, she has always felt that she is female, despite being born with a male body.  Plaintiff describes herself as a "pre-operative transsexual."  She has been taking female hormones that

have changed her outward appearance in some ways; however, she retains her male genitalia. In 1999 she changed her name from Michael Etsitty to Krystal Sandoval Etsitty. She officially changed her Utah driver's license designation from male to female.

In October 2001, Plaintiff accepted a job working as an operator for UTA. After successfully completing a six-week training course, she was assigned to a position as an extra-board operator, as are all new operators. Extra-board operators fill in for regular operators who are on vacation or sick, but they are not assigned a permanent route. Plaintiff was a probationary employee, subject to increased scrutiny and termination at will. At the time she applied for her job with UTA and throughout the training period, Plaintiff dressed as a man and used the men's restroom.

UTA never received any complaints from anyone about Plaintiff's performance, appearance, restroom usage, or anything else. She was never disciplined, and her immediate supervisor felt that she was a good bus operator.

Shortly after she was hired, Plaintiff told her supervisor, Pat Chatterton, that she was transsexual and that she would be appearing more traditionally female at work. Betty Shirley, manager of operations, heard a rumor about a man dressing like a woman. When she asked Chatterton about the rumor, he told her that "Mike," an operator on his team was going through a sex change. Ms. Shirley, not knowing how far along in the sex change process Plaintiff had gone, was concerned over which restrooms (male or female) Plaintiff would use. Ms. Shirley contacted Bruce Cardon in Human Resources, and they decided they needed to meet with Plaintiff to determine her status. Ms. Shirley expressed concern about Plaintiff using female restrooms if she had male genitalia.

Ms. Shirley and Mr. Cardon met with Plaintiff and asked her what her status was with regards to the sex change process. Plaintiff confirmed that she was taking hormones, but had not yet had any kind of sex reassignment surgery, so she continued to have male genitals. Ms. Shirley and Mr. Cardon expressed concern about potential UTA liability based on complaints that may result from Plaintiff using a female restroom, whether in a UTA facility or out in the field. They were also concerned that Plaintiff might switch back and forth between male and female restrooms. Also, they both understood, based on their conversation with Plaintiff, that she had some kind of written direction that required that she use female restrooms.

UTA operators use public restrooms along the route when necessary. UTA has arranged with certain businesses to allow bus operators to use their restrooms, but permission can be withdrawn. Ms. Shirley felt that it would be impractical to arrange for a unisex restroom for one operator, particularly a new operator, because new operators always start on the extra board and stay there for an extended time, usually a few years. Extra board operators drive a different route virtually every day, and special arrangements would have to be made on a daily basis or for every route that UTA runs.

Plaintiff admits that Ms. Shirley and Mr. Cardon made it clear that they were concerned about potential liability from co-workers, customers, and the general public as a result of Plaintiff, a biological male, using female restrooms.

Plaintiff also admits that she was never teased or treated disrespectfully during her employment at UTA. No one at UTA criticized her for being effeminate or made any remarks critical of transsexuals. Although Plaintiff said that she suffered emotional distress from being

terminated, she said that the termination was not carried out in a disrespectful or hurtful manner, and that both Ms. Shirley and Mr. Cardon seemed sincerely concerned about the restroom issue.

Finally, Ms. Shirley indicated on the termination record that Plaintiff was eligible for rehire after completion of "his surgery (transformation)," when he no longer had male genitalia.

### III.  STANDARD OF REVIEW

Under Fed. R. Civ. P. 56, summary judgment is proper only when the pleadings, affidavits, depositions or admissions establish there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law.  The burden of establishing the nonexistence of a genuine issue of material fact is on the moving party.[1]  E.g., *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  When summary judgment is sought, the movant bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record and affidavits, if any, it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

In considering a motion for summary judgment, the court must "view all facts and any reasonable inferences that might be drawn from them in the light most favorable to the nonmoving party and determine whether there exists a genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law."  *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567 (10th Cir. 1994).  An issue of material fact is genuine if a "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

---

[1]Whether a fact is material is determined by looking to relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court has determined, after a careful study of all the pleadings, that there are no genuine issues of material fact in this case. All that remains is to determine which party is entitled to judgment as a matter of law. This is a case of first impression in the Tenth Circuit.

### IV. LEGAL ANALYSIS

The question of how Title VII's prohibition against discrimination "because of . . . sex" applies to transsexuals is a complex one. Every federal court that has dealt directly with this issue has held that "Title VII does not prohibit discrimination based on an individual's transsexualism." *Johnson v. Fresh Mark, Inc.*, 337 F.Supp.2d 996, 999 (N.D. Ohio 2003), *aff'd*, 2004 WL 1166553 (6th Cir. May 18, 2004), *citing Ulane v. Eastern Airlines, Inc.* 742 F.2d 1081 (7th Cir. 1984); *Sommers v. Budget Mktg., Inc.,* 667 F.2d 748 (8th Cir. 1982).

Defendants argue that under the *Ulane* line of cases, which based their analysis on plain language and Congressional intent, transsexuality is not covered under Title VII and therefore Plaintiff is not entitled to relief. Plaintiff, on the other hand, argues that *Ulane* does not apply because she is not alleging discrimination based on transsexuality *per se,* but rather she asserts that UTA engaged in "sexual stereotyping" which is prohibited by *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775 (1989). There is currently a great deal of tension between *Ulane* and *Price Waterhouse* on the issue of whether Title VII applies to transsexuals.

**A. Transsexuals are clearly not a protected class under Title VII.**

Although Title VII is a remedial statute, which should be liberally construed, this court agrees with the reasoning of the *Ulane* court, that our responsibility is "to interpret this congressional legislation and determine what Congress intended when it decided to outlaw discrimination based on sex." *Ulane, at* 1084. This court will not expand the application of this

statute beyond the clear intent of Congress, absent a mandate from Congress to do so. The *Ulane* court, noting that in statutory construction, words should be given their "ordinary common meaning," said that the plain meaning of the statute "implies that it is unlawful to discriminate against women because they are women and against men because they are men." *Id* at 1085. The court continued that there is nothing in the statute to indicate that it should apply to "a person who has a sexual identity disorder, *i.e.*, a person who was born with a male body who believes himself female. . . ." *Id.*

Since the decision in the *Ulane* case, members of Congress have repeatedly tried to amend Title VII to prohibit discrimination based on sexual orientation, and all of these attempts have failed. The court in *Oiler v. Winn-Dixie Louisiana, Inc.,* 2002 WL 31098541 *4 n. 53 (E.D.La. Sept. 16, 2002) (listing proposed bills), noted that from 1981 through 2001, thirty-one proposed bills were introduced in the United States Senate and the House of Representatives which attempted to amend Title VII to prohibit employment discrimination on the basis of affectional or sexual orientation. None of them passed. The rejection of these proposed amendments indicates that Congress intended the phrase in Title VII prohibiting discrimination on the basis of sex to be narrowly interpreted. A narrow interpretation would exclude protection for transsexuals. This court agrees with the rationale of the *Ulane* court when it stated as follows:

> In our view, to include transsexuals within the reach of Title VII far exceeds mere statutory interpretation. Congress had a narrow view of sex in mind when it passed the Civil Rights Act, and it has rejected subsequent attempts to broaden the scope of its original interpretation. For us to now hold that Title VII protects transsexuals would take us out of the realm of interpreting and reviewing and into the realm of legislating.

> . . . .  If Congress believes that transsexuals should enjoy the protection of Title VII, it may so provide.  Until that time, however, we decline in behalf of the Congress to judicially expand the definition of sex as used in Title VII beyond its common and traditional interpretation.
>
> . . .[I]f the term "sex" as it is used in Title VII is to mean more than biological male or biological female, the new definition must come from Congress.

**B.  The *Price Waterhouse* prohibition against sex stereotyping should not be applied to transsexuals.**

Even though Congress clearly did not include transsexuals as a protected class under Title VII, some transsexual employees have recently argued, based on *Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989), that they can nevertheless state a Title VII claim if they allege that they were discriminated against because they failed to conform to sex stereotypes (including stereotypical norms about dress and appearance). *See, e.g. Smith v. City of Salem,* 369 F.3d 912 (6th Cir. 2004).  In *Price Waterhouse,* a female senior manager was denied partnership in the firm because she was considered too "macho" for a woman.  She was told that she would improve her chances for partnership if she were to take "a course at charm school," "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry."  *Price Waterhouse,* at 235.  The Supreme Court held "in the context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender."  *Id.* at 250.

The Sixth Circuit, in two recent cases, has applied the *Price Waterhouse* rationale to transsexuals, and has concluded that *Ulane* and its progeny are no longer good law.  In *Smith v. City of Salem,* 378 F.3d 566 (2004), a firefighter began treatment for his Gender Identity Disorder.  When he began "expressing a more feminine appearance" at work, as prescribed by his doctors, his co-workers began commenting that his appearance and mannerisms were not

masculine enough.  The City of Salem had Smith take three separate psychological exams and later suspended him.  The Sixth Circuit upheld Smith's claim of gender discrimination, stating, "[D]iscrimination against a plaintiff who is transsexual - and therefore fails to act and/or identify with his or her gender - is no different from the discrimination directed against Ann Hopkins in *Price Waterhouse,* who, in sex-stereotypical terms, did not act like a woman."

This court disagrees.  There is a huge difference between a woman who does not behave as femininely as her employer thinks she should, and a man who is attempting to change his sex and appearance to be a woman.  Such drastic action cannot be fairly characterized as a mere failure to conform to stereotypes.  An authoritative treatise on Gender Identity Disorder states the following:

> Gender Identity Disorder can be distinguished from simple nonconformity to stereotypical sex role behavior by the extent and pervasiveness of the cross-gender wishes, interests, and activities.  This disorder is not meant to describe a child's nonconformity to stereotypic sex-role behavior as, for example, in "tomboyishness" in girls or "sissyish" behavior in boys.  Rather, it represents a profound disturbance of the individual's sense of identity with regard to maleness or femaleness.

American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 564 (4th ed. 1994).  Clearly, the medical community does not equate transsexualism with a mere failure to conform to stereotypes.

It should also be noted that courts have continued, even after *Price Waterhouse*, to follow the narrow *Ulane* approach that the term "sex" in Title VII refers to biological sex and nothing more.  "Long after *Price Waterhouse* was decided, courts have continued to hold that discrimination on the basis of sexual preference or orientation is not discrimination based on a person's 'sex.'" *Oiler at* *5 n. 59 (collecting cases).  In *Spearman v. Ford Motor Co.,* 231 F.3d

1080 (7th Cir. 2000), also decided after *Price Waterhouse,* the Seventh Circuit followed the *Ulane* court's reasoning that "Congress intended the term 'sex' to mean 'biological male or biological female,' and not one's sexuality or sexual orientation." The court went on to state that "harassment based solely upon a person's sexual preference or orientation (and not on one's sex) is not an unlawful employment practice under Title VII. *Id.* at 1084.

Furthermore, Defendants have noted that because it is undisputed that transsexuals as such are not protected under Title VII, the same workplace rules that apply to transsexuals would be applicable to non-transsexuals as well. Taken to the extreme, the theory in the *Smith* case would mean that if an employer cannot bar a transsexual male from dressing and appearing as a woman (because it would be sex stereotyping under *Price Waterhouse*), then a non-transsexual male must also be allowed to dress and appear as a woman. In fact, if something as drastic as a man's attempt to dress and appear as a woman is simply a failure to conform to the male stereotype, and nothing more, then there is no social custom or practice associated with a particular sex that is not a stereotype. And if that is the case, then any male employee could dress as a woman, appear and act as a woman, and use the women's restrooms, showers and locker rooms, and any attempt by the employer to prohibit such behavior would constitute sex stereotyping in violation of Title VII. *Price Waterhouse* did not go that far.

This complete rejection of sex-related conventions was never contemplated by the drafters of Title VII and is not required by the language of the statute or the Supreme Court opinion in *Price Waterhouse.* Even in *Nichols v. Azteca Rest. Ent., Inc.*, 256 F.3d 864 (9th Cir. 2001), which Plaintiff cites for the proposition that harassment "based upon the perception that [the plaintiff] is effeminate" is discrimination because of sex in violation of Title VII, the court

stated, "We do not imply that all gender-based distinctions are actionable under Title VII. For example, our decision does not imply that there is any violation of Title VII occasioned by reasonable regulations that require male and female employees to conform to different dress and grooming standards." *Id* at 875, n. 7.

**C. In any case, *Price Waterhouse* does not apply here, because Plaintiff was not fired for failure to conform to a particular gender stereotype.**

Even if *Price Waterhouse* were construed to apply in some situations to transsexuals, it clearly does not apply here. There is no evidence that Plaintiff was fired because she failed to conform her appearance to a particular gender stereotype. Plaintiff admits that she was treated respectfully, and that she was never criticized or ridiculed for her appearance. Ms. Shirley and Mr. Cardon both expressed concern from the beginning about what restroom Plaintiff would use, and Plaintiff herself admitted that their concern seemed genuine. Ms. Shirley explained that the reason she discharged Plaintiff was her concern that Plaintiff's expressed intent to use public women's restrooms while working for UTA could create some liability for the company. There is no evidence that the defendants required Plaintiff's appearance to conform to a particular gender stereotype, only that they required her "to conform to the accepted principles established for gender-distinct public restrooms." *Johnson v. Fresh Mark* at 1000. This is a legitimate non-discriminatory reason for dismissing her.

It is also undisputed that Ms. Shirley stated on Plaintiff's termination record that Plaintiff was eligible for rehire after completion of "his surgery (transformation)," when he no longer had male genitalia. This also demonstrates that Ms. Shirley had no animosity toward Plaintiff because of her status as a transsexual, or because she did not act or appear in conformance with stereoptypical notions about how males should behave or appear.

Plaintiff has argued at length that the restroom usage concern must be pretextual because no one had complained about Plaintiff's restroom usage, and Ms. Shirley had not checked into possible alternatives. However, as Defendants point out, Ms. Shirley's failure to conduct a survey to confirm whether her concern was legitimate in no way establishes that this was not her actual concern. To show pretext, the plaintiff must call into question the honesty or good faith of Ms. Shirley's expression of concern. *See Exum v. United States Olympic Committee,* 389 F.3d 1130, 1137-38 (10th Cir. 2004) ("It is not enough that a fact finder could disagree with the employer's assessment. The relevant inquiry is not whether [the defendant's] proffered reasons were wise, fair or correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs.").

Defendants also points out, and the court agrees, that no study is necessary to conclude that many women would be upset, embarrassed, and even concerned for their safety if a man used the public restroom designated exclusively for women. Concerns about privacy, safety and propriety are the reason that gender specific restrooms are universally accepted in our society. Even Plaintiff stated in her deposition that it would be inappropriate for a man to use a women's restroom. Plaintiff, although in the process of changing her sex, still had male genitalia, and there is no evidence that Ms. Shirley's stated concern about restroom usage was pretext for discrimination.

Plaintiff also claims as evidence of pretext, the differential treatment of similarly-situated employees. The court finds no merit to this argument. Men who were reprimanded rather than discharged for leaving restrooms messy were in no way similarly situated to Plaintiff.

**D.  Defendant is also entitled to summary judgment on Plaintiff's Equal Protection claims under 42 U.S.C. § 1983.**

The elements of a plaintiff's case for employment discrimination are the same whether the case is brought under Title VII or under 42 U.S.C. § 1983.  Therefore, Defendants are entitled to summary judgment on Plaintiff's claims under § 1983 against both UTA and Betty Shirley for the same reasons discussed above.

## CONCLUSION

This court does not condone discrimination in any form, and is sympathetic toward Ms. Etsitty.  However, because of the current status of the law, and for the reasons stated above, Plaintiff's Motion for a Partial Summary Judgment is denied, and Defendants' Motion for Summary Judgment is granted.

SO ORDERED.

DATED this 24th day of June, 2005.

BY THE COURT:

_____
DAVID SAM
SENIOR JUDGE
UNITED STATES DISTRICT COURT